## CHARLES GARDNER *v.* THE STATE.

1. CHARGE OF THE COURT — PRACTICE IN THE COURT OF APPEALS.— In a trial for murder the law of self-defense, though invoked by the evidence, was charged in a merely negative form, and the charge was applicable to a case in which the accused gave the provocation, though there was no evidence tending to support that theory. But the defense neither excepted to the charge at the time nor relied on its errors in his motion for a new trial, and it is not obvious that the accused, who was convicted of manslaughter, was seriously prejudiced by the errors in the charge. *Held,* that the objections to the charge come too late, being mooted in this court for the first time.

2. MANSLAUGHTER — EVIDENCE.— The wife of the deceased was the only witness to the killing, and she was allowed, over objection by the defense, to testify that the accused, a few minutes before he shot her husband, made indecent proposals to her; but of this fact the deceased was never apprised, and nothing indicates that it influenced or explains the motives or acts of either the deceased or the defendant. *Held,* that the testimony was irrelevant and of a character likely to incense the jury against the defendant, and to deprive him of a fair trial; and objection having been duly made by the defendant (who was convicted of manslaughter), the admission of the evidence was material error.

APPEAL from the District Court of Tom Green. Tried below before the Hon. A. O. COOLEY.

The indictment charges the appellant with the murder of Martine Ortis, on September 1, 1881, by shooting him with a pistol. The jury found appellant guilty of man-

slaughter, and assessed his punishment at two years in the penitentiary.

The appellant and Thomas Gardner, it appears, were brothers and partners in a herd of cattle which they kept on herd in Tom Green county, and Martine Ortis, the deceased, was a Mexican who had been but a short time in their employ when he was killed at the Gardners' camp. That Ortis was fatally shot by the appellant early in the night of September 1, 1881, seems not to have been seriously controverted by the defense, who obviously contested the case on the theory of justifiable homicide in self-defense.

Maria Antonia Ortis, the wife of the deceased, was the only eye-witness of the homicide, and the principal witness for the State. Testifying through an interpreter, she stated that no one was present at the camp but herself, the deceased and the defendant, when the latter fired his pistol three times at the deceased, who did not live a minute after the shots were fired. This occurred about seven o'clock in the evening; it was about dusk. There was at the camp a wagon which belonged to the deceased and witness, and they sometimes slept close to it and sometimes off at some distance from it. The deceased had been gone to Joe Glenn's store about half an hour, leaving witness at the camp by herself, when the defendant came there, and wanted to stay with witness. "He said he wanted to sleep with me; he talked to me about staying with me. I did not want to sleep with defendant; I told him to go away from camp before my husband came back. I told him twice to go away; he did not go away. Defendant and I were standing close to the left hand front wheel of the wagon, looking towards the tongue." Witness was leaning against the wheel, and while she was standing there the deceased came into camp from the direction of the store. Deceased's dog came in advance of him, and as he himself came up the

defendant stepped back to a little bush which was about
three yards in front and to the left of the wagon.   When
the deceased came up he called to witness, saying "where
are you, Antonia?"   She replied "here I am," and then
he asked her where his pistol was, and she told him it
was on the front of the wagon.   The pistol was in the
scabbard and hanging by the belt on the wagon-bed.
Deceased hung the belt over his left shoulder, with the
pistol in the scabbard, and the scabbard on the belt, and
it hung so that the pistol was on his back.   When de-
ceased asked for his pistol the defendant was standing at
the bush, but when he fired he was standing at the point
of the wagon tongue, and deceased was at the wagon-
bed, between the left front wheel and the tongue, with
his back towards the defendant.   At the first shot the
deceased dodged downwards.   The other two were fired
in quick succession, and the deceased fell down and died
in less than a minute.   He was making no demonstra-
tions to hurt the defendant when the latter fired on him
within half a minute after he threw his pistol belt over
his shoulder.   Witness was looking at the defendant
when he commenced shooting.   It was about three and a
half yards from the bush to the point of the wagon-
tongue.   As the deceased's dog came into the camp the
defendant saw it and stepped to the bush, saying "There
comes Martine's dog," and witness replied "And there
comes Martine now."   The deceased said nothing when
he was shot or when he fell.   He fell on his left side
against the front wheel; his pistol remained in the scab-
bard, and his arms lay on the ground on each side of
him.   After the shooting, the defendant walked slowly
off and returned no more that night.   He did nothing to
help care for the deceased's body.   Witness cried loudly
for help, but no one came.   As soon as the deceased was
dead, she went for assistance to the house of Mr. West-
fall, the storekeeper for Joe Glenn.   There were three

wounds on the deceased; two of them were in his right
side and the third through his right ear.   Witness did
not know from what direction the bullet  came which
passed through his ear, but she was certain that his back
was to the defendant when the latter commenced shoot-
ing.   There was no wound in deceased's head, except a
slight scratch just back of the right ear.   The wounds in
his body were about the middle of the right side; one rib
was between the two bullet-holes.   There was nothing in
the hands of the deceased when he fell.   Witness stayed
at the storekeeper's house that night, but after first going
there she went right back to the camp, and on her way
there met the deceased's brother, and he went with her
to the camp, where she then saw Thomas Gardner and
other persons whose names she did not remember.   De-
ceased's brother took the pistol off of the left arm of the
deceased.   It was in the scabbard and lying on the
ground, and the left arm of the deceased was lying on
it when his brother took it up.   Defendant and the de-
ceased had been herding horses together during the day,
and ate supper together, very friendly, a little while be-
fore the killing.

The cross-examination of the witness elicited but little
in addition to her testimony in chief.   She denied that
she had told Mr. McIlvaine that the defendant did not
propose to sleep with her the night of the killing.   What
she did tell McIlvaine was that the defendant had never
made improper advances to her until that night, but that
he did then.   She also denied that, the day after the ex-
amining trial, she had asked McIlvaine whether the de-
fendant could contradict her if she had told what was not
true.   (These inquiries specified time and place of the
imputed statements, and McIlvaine, testifying for the
defense at a subsequent stage of the trial, explicitly con-
tradicted the witness as to both the statements which she
denied.)   Witness stated that the defendant and the de-

ceased had been on the very best of terms until the time of the killing.

The re-direct examination of the witness gave her account of what passed between her and McIlvaine on the occasions referred to in her cross-examination, and in the course of it she said that McIlvaine was the interpreter at the examining trial,— a statement which he contradicted in his testimony for the defense. With the evidence of the deceased wife, which is greatly condensed in the foregoing statement, the prosecution closed in chief.

Rufus Thomas, testifying for the defense, stated that in the forenoon of the day of the killing he and the deceased were herding cattle together, and in conversation the deceased said that he intended to kill the defendant within three days because the defendant had put his (the deceased's) brother on a wild horse. This was told to witness by the deceased about nine or ten o'clock in the forenoon, and witness went to dinner at the camp of the defendant, and told the defendant that the deceased intended to kill him within three days, and that he had better look out. Ben McGrew was present when witness told the defendant. The witness was a herdsman for Joe Glenn and the deceased a herdsman for the Gardners at the time they had the conversation.

The evening of the killing the witness, with Thomas Gardner and Ben McGrew, went from the Gardners' camp to the store, and while they were there the deceased came to the door, looked in, and immediately left. Witness did not know from what direction the deceased came to the store, nor in what direction he went away. While witness was at the store he heard three pistol shots in the direction of the camp, and he, with Thomas Gardner, Ben McGrew, and a crippled Mexican understood to be a brother of the deceased, immediately ran to the camp. Deceased was lying there on his back, dead, with his feet pointing towards the point of the wagon tongue and

about five feet from the wagon tongue. When witness and his companions reached the camp no one else was there; but the wife of the deceased soon came there from the direction of Westfall's.

On his cross-examination the witness stated that when he told defendant of the deceased's threat to kill him, defendant only replied "Is he?" At the time the deceased made the threat he just rode up to witness and told it to him, and said nothing more.

Ben McGrew, for the defense, testified that he was living at Joe Glenn's at the time the deceased was killed, and was at the Gardners' camp on the day of that event, about noon, when Rufus Thomas came into camp and to where the defendant and the witness were, and told the defendant that the deceased had threatened to kill him, the defendant, within three days. That night the witness, and Thomas Gardner, Rufus Thomas and the crippled Mexican were at the store, and, three shots being fired in the direction of the camp, they all ran down there,— the crippled Mexican coming in about a minute behind the others. Deceased was lying on his back, dead, with his body about four or five feet from the wagon tongue. He had the belt over his left arm and his right hand on the handle of the pistol, which was partly drawn out of the scabbard. His left hand was on the scabbard of the pistol. The right hand was holding the handle of the pistol, but not grasping it tight. The lame Mexican took the pistol off from deceased's left arm, and put it around his own waist. The wife of the deceased came into camp that night from the direction of Westfall's, and she stayed in the camp all that night along with witness and his brother. She asked witness and his brother to help her wash the body, and they did so. There was one bullet-hole in the deceased's right side, under the arm. There was another bullet-hole through his right ear, and a slight graze behind it; and there was a red mark on his right

cheek in line with the ear, but not breaking the skin. The cross-examination elicited nothing material.

J. D. Spears, sheriff of the county, testified for the defense that a warrant was issued for the defendant, and witness tried to find and arrest him, but failed to find him; and on the day of the examining trial, which was about three weeks after the killing, the defendant voluntarily surrendered himself.

Joe Glenn, for the defense, testified that he examined the body of the deceased the day after the killing. Speaking of the bullet-hole through the right ear, witness said that in front, where the ball entered, it was smooth, but that behind the ear the skin was torn and ragged. There was a slight scratch on the head just back of the ear, and a red mark on the right cheek in line with the ear, but the skin was unbroken. And with reference to the bullet-hole in the right side, the witness stated that, unless the arm was raised, the hole could not have been made without the arm also being perforated by the ball. The wound could not have been made when the back of the deceased was towards the person shooting.

The defense introduced A. McIlvaine, mentioned in the testimony of the deceased's wife, but the substance of his evidence has already been stated in connection with hers.

In rebuttal the State introduced Charles Mullins, a deputy sheriff, who testified that in the night of the killing the defendant's witness Rufus Thomas came to San Angela and informed witness of the homicide. The next day witness went with General Portis to the Gardners' camp to hold an inquest on the body of the deceased. On their way back to San Angela they met Rufus Thomas going back towards the camp. General Portis asked Thomas if the deceased had made any threats against the defendant. Thomas replied that the deceased had said to him that the defendant had driven the lame brother of deceased out of camp, and that he, the deceased, would kill the defendant or any other man who imposed on his lame brother.

Thomas said that no other threats had been made by the deceased.

General D. Y. Portis, for the State, testified that he was a justice of the peace of Tom Green county, and, on the day after the killing, he held an inquest on the deceased. Witness had heard the testimony of the preceding witness Charles Mullins, and corroborated it fully and circumstantially.

—— Ortis, for the State, testified that he was a half-brother of the deceased, and had been working for Thomas Gardner but was not in his employ at the time of the killing, though he was staying at the camp with the deceased and his wife, and was there about noon on the day of the killing. The wife of the deceased cooked dinner for deceased and the defendant, and they ate dinner together, friendly. While they were there in camp there was nothing said to the defendant by the witness Thomas about threats. After dinner, the defendant told witness to get on his horse and go and help the deceased to herd the cattle. Witness went, and was gone nearly an hour, and could not say who was in camp while he was absent from it. About dusk, witness was at the store with Thomas Gardner, Rufus Thomas and Ben McGrew. He heard three shots in the direction of the camp, and they all ran down to the camp. Witness got there soon after the others, and saw the deceased lying dead, near the wagon wheel. He was lying a little on his left side. His pistol-belt was over his left arm, and that arm was on the pistol, which was on the ground, fully in the scabbard and not drawn out. His right arm was lying on the ground, by his side. Witness took the pistol off of the deceased, and put it around his own waist.

*Bentley, Ferguson & Spence*, for the appellant, filed an able and elaborate argument.

*H. Chilton*, Assistant Attorney General, for the State.

HURT, J.   The appellant was convicted of manslaughter, and his punishment assessed at two years' imprisonment in the penitentiary.

The evidence, we think, required a charge on the law of self-defense.   This was given by the court, negatively. This was error.   The court below should apply the law appropriately to the defense or defenses of the prisoner whenever there is evidence tending to support them.   The court charged the law applicable to a case in which there was evidence tending to show that defendant provoked the difficulty or produced the occasion, etc.   There was no evidence tending to make such a cause; hence this charge was not called for, and it was wrong to give it.

But neither of these charges was excepted to at the time, nor did defendant ask a proper charge on the subject of self-defense; nor were they, or either of them, made a ground for a new trial.   It is the duty of the trial judge in a written charge to set forth the law applicable to the case; and this must be done, whether asked for or not.   But, to authorize this court to reverse a judgment because the charge fails to set forth the law applicable to the case, or because an abstract proposition is contained. in the charge, the proper charge must have been requested and refused, or the defendant must have objected at the time.   Code Crim. Proc. art. 685.

The right to reverse a judgment upon these grounds is derived from another source, although no objection was made, nor the proper charge requsted and refused.   By art. 777, Code Crim. Proc., it is provided that, "New trials in cases of felony *shall* be granted for the following causes, and for no other."   .   .   .   2.   "When the court has misdirected the jury as to the law, or has committed any other material error calculated to injure the rights of the defendant."   It is held in *Bishop* v. *State*, 43 Texas, 390, and in a number of cases subsequent to that case, "that if it appears that the court has misdirected the jury as to

VOL. XI—18

the law, or has committed any other material error *calculated to injure the rights of the defendant*, and that these errors were called to the attention of the court by being made a ground for new trial, the action of the court in overruling the motion for new trial is such an error as will justify the Supreme Court in reversing the judgment." It will be seen that this ground for reversal constitutes an exception to the rule stated in art. 685, Code Crim. Procedure. We are not disposed to engraft upon the article other exceptions, unless it is *evident* that an injury has been done defendant; not merely an injury, but one of a radical or serious character.

If defendant had brought himself within either of the rules above stated, we would reverse the judgment upon these defects in the charge; but, not having done so, we are of the opinion that he is too late, urging as he does, for the first time, these errors in this court.

The State proved, over the objections of defendant, that he had made improper advances to the wife of the deceased, on the night of but prior to the killing. These proposals were not communicated to deceased, nor did he ever know of them, so far as the record shows, at any time. They were made in the absence of deceased, nor does the evidence show, or tend to show, that deceased suspected anything was wrong in regard to this matter. This being the state of the case touching this matter, we are unable to see the relevancy of this evidence. It could not possibly tend to explain the conduct of deceased; nor could it act as a provocation to induce deceased to make the attack upon defendant, if any was made. It certainly could not have been a motive for the killing, nor was it calculated to explain the conduct of defendant, he being fully aware that deceased was not informed of his conduct. There could have been but one effect produced by this evidence, and that was to seriously prejudice defendant with the jury. He stood before them in a bad

light; indeed in the light of a wretch who had not only attempted to destroy the conjugal happiness of deceased, but had finally, in the presence of his wife, taken his life. This evidence, we think, was not only irrelevant, but was calculated to arouse the jury to such a degree of contempt for, and indignation towards defendant, as would render them incapable of considering in an impartial light his defense, although it may have been a legal one. We are not expressing an opinion as to whether defendant's plea of self-defense was or was not sustained by the evidence. He had the right to an impartial trial; to require the State to convict him upon legal evidence. This, we think, was not done.

The other assignments are not well taken. For the above error the judgment is reversed and cause remanded.

*Reversed and remanded.*